## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### –Northern Division–

ROBERT L. CANDY
12605 Moores Hollow Road
Cumberland, Maryland 21502

and

ANIMAL PARK, CARE & RESCUE,
INC.
10105 Cottage Inn Lane
Cumberland, Maryland 21502

and

TRI-STATE ZOOLOGICAL PARK
OF
WESTERN MARYLAND, INC.
10105 Cottage Inn Lane
Cumberland, Maryland 21502

*Plaintiffs*

–v–

PEOPLE FOR THE ETHICAL
TREATMENT OF ANIMALS, INC.
501 Front Street
Norfolk, Virginia 23510

*Serve On:*
*Ingrid E. Newkirk, Resident Agent*
501 Front Street
Norfolk, Virginia 23510

and

FOUNDATION TO SUPPORT ANIMAL
PROTECTION, INC. (d/b/a The PETA
FOUNDATION
501 Front Street
Norfolk, Virginia 23510

Case No. _____-

JURY TRIAL PRAYED

Serve On:
Ingrid E. Newkirk, Resident Agent
501 Front Street
Norfolk, Virginia 23510

and

INGRID NEWKIRK, Individually
501 Front Street
Norfolk, Virginia 23510

and

BRITTANY PEET
c/o the PETA Foundation
1536 16th Street, NW
Washington DC 20036

and

DELCIANNA WINDERS
c/o the PETA Foundation
1536 16th Street, NW
Washington, DC 20036

and

JEFFREY KERR
c/o the PETA Foundation
1536 16th Street, NW
Washington, DC 20036

and

MARTINA BERNSTEIN
c/o the PETA Foundation
1536 16th Street, NW
Washington, DC 20036

and

COLIN HENSTOCK
501 Front Street
Norfolk, Virginia 23510

and

CHRIS FONTES
501 Front Street
Norfolk, Virginia 23510

*Defendants.*

## **COMPLAINT**

### I.  **Jurisdiction and Venue**

1.     This Complaint is brought pursuant to the provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. This Court has subject matter jurisdiction over the claims for relief arising under RICO pursuant to 18 U.S.C. § 1964(c). Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965. The tortious, fraudulent, and criminal acts alleged herein took place in large part in the State of Maryland and could not have occurred but for acts undertaken by the Defendants in the State of Maryland.

### II.  **Overview of Predicate Offenses**

2.     This is a civil action brought by the Plaintiffs pursuant to RICO against Ingrid Newkirk, Jeffrey Kerr, Brittany Peet, Martina Bernstein, Delcianna Winders, Colin Henstock, Chris Fontes, The Foundation to Support Animal Protection, Inc. (d/b/a the PETA Foundation), and People for the Ethical Treatment of Animals, Inc. (hereinafter "PETA"). Other Defendants may be added by amendment if discovery should reveal a need.

3

3.      For a period extending at least 20 years for some individual Defendants, continuing through the filing of this Complaint, and expected to continue into the foreseeable future, Defendants PETA, Newkirk, Kerr, and other known and unknown agents and employees of various defendants, collectively have constituted an associated-in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. § 1961. Defendants PETA, Newkirk and Kerr, together with others known and unknown, each participated in the operation and management of the Enterprise. The enterprise is an open-ended enterprise almost certain to continue into the future given Defendants' present intentions.

4.      For a shorter period of time, but for at least a period of several years, continuing through the filing of this Complaint, Defendants Winders, Peet, Bernstein, Henstock, Fontes, and the PETA Foundation, joined the Enterprise and voluntarily and knowingly participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 USC § 1962(c) and (d). The enterprise is open-ended and almost certain to continue into the future given the Defendants' present intentions.

5.      From at least December 2014, continuing through the filing of this Complaint, all Defendants named herein conspired to conduct the affairs

of the Enterprise through a pattern of racketeering activity in violation of 18

USC § 1962(d).

6. Together and acting in concert with others in violation of the

Acts set forth above, the Defendants have acted to further a scheme to

damage the Plaintiffs' business interests, to trespass on the Plaintiffs'

property by deceit and by fraud, to illegally gather and distribute to the public

various photographs, videos, and other materials as a result of trespassing

onto the Plaintiffs' property, and have used those acts to attempt to extort the

Plaintiffs' property from them, with that property being five tigers and a lion.

7. The Defendants have further acted in concert and in violation of

the RICO statute by committing acts of mail and wire fraud, namely,

disseminating false information to the donors on lists kept by PETA, in order

to solicit donations under false pretenses, and actually collecting donations,

through the US Postal Service and by wire service including internet payment

sources and electronic transfers.

8. In order to facilitate this mail and wire fraud scheme, it was

necessary for the Defendants to injure the Plaintiffs in their business interests

by publishing and transmitting false and fraudulent statements about the

Plaintiffs to various donors throughout the United States, who were

defrauded by this scheme.

9.     The Defendants have further conspired and actually committed acts in violation of the RICO statute by stealing or otherwise misappropriating photographic, video, and audio imagery from the Plaintiffs' business premises and transport those stolen and misappropriated images in interstate commerce in violation of the Hobbs Act, 18 USC § 1951, and the Travel Act, 18 USC § 1952.

10.     The fraudulently obtained images were obtained for purposes of extortion and to facilitate the above described mail and wire frauds committed pursuant to 18 USC § 1341, 18 USC §1343, and 18 USC §1346. The Defendants, having also sent agents to fraudulently "volunteer" to serve as workers at the Plaintiffs' facility, also defrauded the Plaintiffs of the right of honest services in furtherance of the mail and wire fraud schemes.

11.     Under the Hobbs Act, fear of economic injury wrongfully exerted suffices to constitute extortion.

12.     Defendants further knowingly used the stolen and misappropriated recordings in an attempt at extortion by filing an "Endangered Species Act" lawsuit (hereinafter, ESA lawsuit) against the Plaintiffs in the United States District Court for the District of Maryland, attempting to force the Plaintiffs to give up five tigers, a lion, and two lemurs by filing a lawsuit predicated in large part upon the fraudulently obtained imagery.

13.     Several of the Defendants, including Defendants Peet, Winders, Bernstein, and Kerr, are attorneys admitted to the practice of law in various jurisdictions, and are believed to have acted in bringing the ESA lawsuit with full knowledge of the manner in which the information was obtained and the criminal and fraudulent acts perpetrated in obtaining that information.

**III.    Details of Wrongful Acts of Defendants and the Roles of Various Defendants**

14.     Defendant PETA is an animal rights activist group that most persons would consider radical. They espouse a philosophy that no animal should be eaten, worn, exhibited, or used for entertainment.

15.     For at least 20 years, PETA has engaged in activity throughout the country aimed at advancing their philosophy. They have engaged in press campaigns and protests against zoos, circuses, fur sellers, supermarkets, butcher shops, and a variety of other industries that are incompatible with PETA's central tenets.

16.     PETA has also faced allegations in other lawsuits of similar activities to those alleged herein, and has no defense of innocent mistake or lack of intent. *Mens rea* is well established by the myriad acts of PETA in the past, some of which are set forth *infra.*

17.     PETA also uses its activities to raise funds from persons who may be sympathetic to its cause or to its perceived cause. PETA had annual

revenues of approximately $48 million dollars in 2017, but annual operating expenses of approximately $67 million.

18.     One of PETA's many activities is to engage in litigation against those who offend the core tenets of PETA. PETA has sued the Miami Seaquarium unsuccessfully, and has also sued a large number of smaller zoos, circuses, and other animal exhibitors, with varying levels of success. PETA also sued a photographer in an attempt to establish copyright rights for a macaque that took a "selfie" photograph with a photographer's camera.

19.      Among the many smaller zoos that have become targets of PETA's activism is Plaintiff Tri-State Zoological Park of Western Maryland, Inc. (hereinafter, "Tri State").

20.     Plaintiffs Tri State and Animal Park, Care and Rescue, LLC (hereinafter, "Animal Park") are the creation of Robert Candy, who started and primarily operates the companies as a way to rescue, care for, and exhibit animals at a small facility in Cumberland, Maryland.

21.     Over the last several years, agents of PETA, at that time not identified and unknown to the Plaintiffs, have entered the Plaintiffs' facility for the purpose of taking photographs, videos, and audio recordings designed to cast the facility in the most unflattering light possible, and have entered while not identifying themselves despite a sign that clearly states that anyone affiliated with PETA must identify themselves before being admitted.

22.     On multiple days in 2014 and 2015, Defendants Colin Henstock and Chris Fontes, as well as another person not yet a defendant in this action, entered the Plaintiffs' facility while it was closed for the season, by pretending to be there as *bona fide* volunteers interested in helping the Plaintiffs by cutting wood, cleaning, and doing general repairs. They lied about where they were from, saying they were from Hagerstown, which was false. They also directly lied when Plaintiff Robert Candy asked them if they were with any sort of animal rights organization.

23.     Contrary to the false representations of the Defendants, the Defendants arrived at the zoo with hidden cameras and hidden audio recording devices in order to conduct an "undercover investigation" on behalf of Defendant PETA.

24.     The Defendants Colin Henstock and Chris Fontes therefore trespassed by false pretense upon the property of the Plaintiffs, and also violated a fiduciary duty that they created when they promised to Robert Candy, with myriad false representations, that they were there as *bona fide* volunteers, and when they failed to disclose and even affirmatively lied about their affiliations with an animal rights group.

25.     PETA has made numerous meritless complaints to the United States Department of Agriculture's APHIS (Animal and Plant Health Inspection Service), and has made meritless complaints also to the Animal

Control authorities of Allegany County, falsely alleging animal cruelty in an attempt to have the government take away the Plaintiffs' property.  If Plaintiff Robert Candy had known that Henstock and Fontes were agents of PETA, he would have asked them to leave the premises immediately.

26.     Most of the complaints made by PETA are meritless and PETA is aware that those complaints lack merit, but PETA uses its campaign against the Plaintiffs as a fund raising mechanism, and in so doing, defrauds its donor base with false statements, while injuring the Plaintiffs' business interests and using those injurious statements in an attempt to extort the Plaintiffs' property from them.

27.     The Defendants Chris Fontes and Colin Henstock not only made surreptitious video footage of the Plaintiffs' facility, but made illegal audio recordings of Plaintiff Robert Candy and a volunteer at the facility, Kathy Moran. Those illegal audio recordings constituted and still do constitute a felony criminal offense in the State of Maryland.

28.     Defendants Chris Fontes and Colin Henstock were sent to the Plaintiffs' facility by in house counsel for PETA, who are also employees of the Defendant PETA Foundation, Jeffrey Kerr, Brittany Peet, Delcianna Winders, and Martina Bernstein. All of these persons are licensed attorneys and full time employees of the PETA Foundation, but upon information and belief, not licensed to practice law in the State of Maryland. Defendants Peet and

Winders either instructed Defendants Chris Fontes and Colin Henstock to make illegal and/or tortious audio and video recordings of the Plaintiffs' facility, or, upon discovering that they had done so, ratified such acts on behalf of Defendant PETA and The PETA Foundation, and decided to make use of the illegally and tortiously obtained material. Defendants Peet and Winders further knew that Defendants Henstock and Fontes would be entering onto the premises under fraudulent pretenses and expressly authorized them to make false representations to the Plaintiffs in order to access the facility for fraudulent purposes.

29.     Contrary to law, and in violation of their duties as attorneys not to advocate, direct, or conspire in illegal activities, the Defendants Peet and Winders sent Defendants Henstock and Fontes in interstate travel to conduct an illegal investigation of the Plaintiffs' facility in violation of the Hobbs Act and the Travel Act. Overall responsibility for these activities was with Defendants Kerr and Newkirk, who authorized all activities undertaken by Fontes and Henstock.

30.     Defendant Martina Bernstein was aware of and involved in the supervision and oversight of the illegal trespass and was involved in the subsequent efforts to use the fraudulently obtained materials to extort property from the Plaintiffs. There may have been other PETA attorneys

involved but discovery will be required to determine if additional defendants should be made parties to this case.

31.     The Defendants Chris Fontes and Colin Henstock, upon instructions by the other Defendants, also specifically attempted and partially succeeded in receiving a tour of the areas of the zoo where the general public is not usually allowed. They took secret video and audio of those visits in the employee areas of the zoo for the specific purpose of later using the footage obtained to make a public safety complaint to the USDA APHIS service, which licenses facilities that exhibit animals.

32.     Upon information and belief, Defendants Kerr, Winders, Bernstein and Peet specifically knew or should have known that the activities of Fontes and Henstock were illegal, and used that illegally obtained evidence to make a complaint to the USDA APHIS service in an effort to injure the Plaintiffs' business.

33.     The Plaintiffs herein were not aware of the extent of the surveillance or the fact that the "volunteers" Henstock and Fontes were employees of PETA until after PETA filed Endangered Species Act litigation in the United States District Court of Maryland in 2017, and only discovered the illegal audio recording and the agency relationship of Henstock and Fontes in April, 2018, through discovery produced during that lawsuit, which discovery

is still the subject of an ongoing dispute, and may ultimately produce evidence of further illegal activity.

34.     The Defendants have further engaged other persons not yet defendants in this action to aid and assist them in this ongoing Enterprise, including Holly Brown, Casey Brown, and Heather Rally. Upon information and belief, Rally was a PETA employee at all times relevant to this action, and the Browns were volunteers who were asked to act as investigators and were compensated or reimbursed for expenses.

35.     Upon information and belief, Holly Brown and Casey Brown are not licensed as private investigators, but were required to be so licensed by the laws of the State of Maryland, therefore, committed a criminal misdemeanor by undertaking an investigation of the Plaintiffs' facility during the year 2017.

36.     During 2017, the Browns, at the request of PETA and the various PETA Foundation attorneys, visited the Plaintiffs' facility under false pretenses and took photographs of Mbube, a beloved member of the zoo, who was stricken with a pituitary tumor or other condition causing Addison's Disease, which caused an emaciated condition. The lion was under the care of a veterinarian and was being treated with testosterone and other medications to see if he would respond to that treatment and begin to regain weight. PETA complained to the USDA APHIS service, and a direction was written to obtain

a second opinion from a large cat expert. Due to that direction by the USDA,

the lion was tranquilized, samples were drawn, and those samples confirmed

the original diagnosis. Nothing was gained other than further trauma and

distress to the lion, caused by PETA.

37.     A short time later, the lion was euthanized due to his illness.

38.     Defendants herein did not honestly represent what had

happened to Mbube, but to make maximum fundraising gains out of the

incident, dishonestly represented what had happened on its website, using

photographs and video recordings obtained by its agents illegally and

fraudulently to attack the Plaintiffs' business interests.

39.     PETA published a photo of the lion in an emaciated condition,

taken surreptitiously by an undercover agent believed to have been one of the

Browns, and made numerous fraudulent statements through the internet

about the lion and the treatment it had received by the Plaintiffs, stating,

among other things, that the zoo had failed "to provide an ailing, dramatically

underweight lion named Mbube with adequate veterinary care." In fact, the

USDA did not cite the zoo for failing to provide adequate care, but simply

wanted the zoo to seek a second opinion before euthanizing the lion, due to

the fact that PETA had made a complaint.  The publication of this photograph

and the fraudulent statements accompanying it were made in interstate

commerce through PETA's website and were published nationwide and

worldwide, from at least September 2017 to the present date, as the

photograph and fraudulent statements remain posted and accessible to the

date of filing of this Complaint.

40.     These misrepresentations were made for fundraising purposes

and both defrauded the Defendants' donors and injured the Plaintiffs'

business interests, by fraudulently soliciting donations by mail and by wire in

interstate commerce, in violation of 18 USC 1341 and 18 USC 1343, that is, the

mail and wire fraud laws. In committing these acts, Defendants voluntarily

and intentionally devised or participated in a scheme to defraud their

prospective donors out of money, and did so with the intent to defraud. It was

reasonably foreseeable that interstate wire communications would be used

and interstate wire communications were in fact used.

41.     PETA has a long history of mischaracterizing inspection reports

by the USDA APHIS service as "citations" even when deficiencies noted on

those forms are given a time frame for correction, and are not fineable or

even subject to adjudication unless the facility fails to correct the noted

condition.

42.     In furtherance of the same mail and wire fraud schemes, PETA

further published on its website, in interstate commerce available not only

nationwide but worldwide, at least since July of 2017, with such publication

being continuous through the date of filing of the Complaint, that "[s]ince the

death of Mbube, another lion named Peka has been held at the zoo in

complete isolation, which is particularly harmful since lions are social

animals. Like the other animals imprisoned at this zoo, Peka doesn't receive

proper enrichment, food, shelter, housing, or sanitation, and she, too, is forced

into unnatural interactions with visiting tourists."

43.     The statement above, in paragraph 42, is materially false in

many of its elements, and makes misleading and material omissions in other

ways.  For example, it is completely false that Peka does not receive proper

enrichment, food, shelter, housing, or sanitation, or that she is forced into

unnatural interactions with visitors. While it is true that she is now the only

lion at Tri State, PETA neglects to state why—it is because PETA had been

threatening to file a lawsuit under the Endangered Species Act in the United

States District Court in Baltimore, and it made no sense to the Plaintiffs to

obtain another lion while that lawsuit was pending. Further, there is no legal

requirement that a lion be grouped with other lions.

44.     Despite the falsehood of these statements, the various

Defendants in this case advanced these statements in full knowledge that the

statements are false and did so to materially deceive its donor base and

increase its donations through mail and wire in interstate commerce, while

causing substantial injury to the Plaintiffs' business interests. The publication

as posted by the Defendants actively solicits donations at the bottom of the very same page.

45.     PETA furthermore engages in inflammatory rhetoric through social media and its email lists, and as a result, Plaintiff Robert Candy has received telephone calls and letters accusing him of all manner of animal cruelty. The Facebook page for Plaintiff Tri-State Zoological Park contains many positive reviews, but mixed among them are vehemently profane and negative reviews, one of them even coming from someone who admits to never having been to the Tri State Zoo, and who does not live in the United States, but states that the zoo has a worldwide reputation for being a dirty place with starving animals. No animal has ever starved at Tri State Zoo.

46.     In furtherance of the false and malicious statements made in order to increase the number of donations via mail and wire in interstate commerce, one person, who identifies herself on the Facebook social media site as Kristine Staser, states that she is an undercover agent for PETA, and as to Tri State Zoological Park, says the following on Tri State Zoological Park's Facebook page [with expletives partially stricken from the original]:

*"A lion DIED there from lack of veterinary care and starvation!! Are you people that selfish to continue to pay GREEDY A\*\*HOLES worth of toxic waste money so animals are available for YOUR selfish entertainment and amusement??? Deplorable conditions....starving animals....suffering...cruelty....ENOUGH!!! Shut the f\*\*\*ing pr\*\*k down!!!*

47.     Another commenter states:

*I have not been there as I don't live in the USA, but the notoriety of this zoo has spread around the world with information that the animals live in small, squalid, cages that are filthy. The tiger lives in deplorable conditions with a small bowl of filthy water, nowhere to run and stretch, nowhere to swim (tigers love the water). The Capuchin is so depressed and unhappy that he pulls his fur out, musing to live in a cage - nowhere to climb, run and no others for company. This place needs to be closed down, and it's animals relocated to sanctuaries. To allow it to remain as it is, in intolerable, inhumane and downright cruel.*

48.     Upon information and belief, it was PETA that falsely published an additional story that Dodger, the capuchin monkey at the zoo, pulls his fur out from distress, when that is not the case. No other party is known to have ever made this claim, and this statement was fraudulently made and published by PETA and the other Defendants in furtherance of the ongoing mail and wire fraud enterprise conducted in interstate commerce.

49.     Another person, seeing the photograph of the lion as published by PETA, falsely presented by PETA as being thin due to neglect, states as follows, with expletives partially deleted from the original:

*Just saw how skinny your lion is! You disgusting people, what the f--k is the matter with you? You are keeping animals in deplorable conditions, depressed, stressed, under fed, in enclosures that represent hell! For GOD'S sake, shut down and get someone with experience in housing them to come and rescue them and then lock yourselves in the yards and rot! The USDA should take your license away and then you should be put in jail for animal cruelty!!! You vile people!!!*

50.     Plaintiff Robert Candy has further received offensive telephone calls from people reacting to calls by PETA to take action and call the zoo and express their outrage. Given PETA's false statements and misleading commentary, it is small wonder that those persons are often quite abusive to Mr. Candy on the telephone.

51.     Defendants have used the illegally obtained images to make complaints to the USDA APHIS service about the Plaintiffs' business, by both mail and wire. The USDA APHIS service has the power to suspend or even terminate the Plaintiffs' license as an exhibitor of animals, and investigated the Plaintiffs' facility as a result of those complaints.

52.     In the Summer of 2017, the Defendant PETA filed an Endangered Species Act claim in the United States District Court of Maryland, alleging that Plaintiffs' treatment of the animals constituted "harming or harassing" the animals covered by the Endangered Species Act, namely, two lemurs, five tigers and a lion.  Since the time of that complaint being filed, two of the animals have died through no fault of the Plaintiffs, and there are presently four tigers and a lion in controversy.

53.     The Federal ESA lawsuit proceeds apace, but no matter the outcome of that litigation, the Defendants have been engaged in the various conspiracies, illegal activities, and the Enterprise alleged herein in an effort to damage the Plaintiffs business interests, to deprive them of their property, and to deprive them of honest services, through the various wire and mail fraud schemes alleged above, and through violation of the Hobbs Act and Travel Act as alleged above.

54.     The case filed by PETA in the United States District Court was not filed in good faith. The legal argument is tenuous at best, and during the

course of discovery in that case, PETA has not limited itself to inspection of the tigers, lion, and lemur areas (the animals at issue in the case), but has insisted on viewing nearly every square inch of the zoo and photographing the same. Their photographer even stuck his camera outside of the fence and took photos of construction debris not on the zoo grounds. There is little doubt these photographs will later be used for further abuse of the Plaintiffs, no matter the outcome of the litigation.  The litigation was filed for an improper and extortionate purpose, and the attorneys for the PETA Foundation knew when the lawsuit was filed that it was based largely upon illegally and fraudulently obtained information.

55.     The Defendants and their various non-defendant affiliates have either trespassed upon the zoo premises owned by Plaintiffs to gather information by fraud, or instructed others to trespass on the zoo premises to gather information by fraud, and have deliberately concealed their identities or instructed others to deliberately conceal their identities for the purpose of fraudulently infiltrating the Plaintiffs' private business on behalf of the enterprise.

56.     The fraudulent acts and subsequent fraudulent statements of the Defendants, furthered through mail and wire in interstate commerce, have led to general disrepute for the Plaintiffs, a loss of visitor and business revenue, and the expenditure of large sums on attorney fees.

### Lack of Mistake, Mens Rea, Past Bad Acts, and
### an Open Ended Scheme

57.     This lawsuit is not taking by surprise a group of Defendants who were ignorant of the law and acted on one occasion in overly zealous good faith. To the contrary, PETA and its affiliates have a long history of egregious violations of this type, other sorts of frivolous and bad faith litigation, and have repeatedly and obstinately stated an intention to continue their various enterprises.

58.     PETA and Defendant Newkirk, as the President of PETA, have both sued and been sued in the past for business espionage, as follows:

59.     In 1996 and 1997, a PETA employee named Michelle Rokke, at the request of Ingrid Newkirk, Defendant herein, infiltrated a biological research lab by posing as a *bona fide* employee, for the purpose of documenting the procedures at the laboratory. After Rokke left the laboratory, PETA made public the footage she obtained in an effort to damage Huntingdon Life Sciences, Inc. This conduct led to a lawsuit in which PETA was represented by, among other attorneys, Jeffrey Kerr, Defendant herein, and Phil Hirschkop, who is now private counsel for Brittany Peet, a Defendant herein.

60.     In the Huntingdon Life Sciences, Inc., case, Huntingdon Life Sciences, Inc. alleged in its complaint that Newkirk, along with a former PETA

employee named Mary Beth Sweetland, and PETA, had previously engaged in the following bad acts in furtherance of an ongoing illegal enterprise:

The alleged prior acts include:

a.      The Boys Town incident: alleged that Newkirk and Sweetland stole confidential documents from Boys Town and transported them across interstate lines in violation of 18 U.S.C. §§ 2314-15, and that Newkirk, Sweetland, and PETA extorted Boys Town by threat of economic harm in violation of 18 U.S.C. § 1951.

b.      The PMU incident: alleged that Rokke traveled to and from North Dakota to carry out PETA's scheme and Sweetland and Newkirk assisted Rokke in violation of 18 U.S.C. § 1952, and that Rokke, Sweetland and Newkirk transported stolen documents in violation of 18 U.S.C. §§ 2314-15.

c.      The Michigan State incident: alleged that Newkirk aided and abetted arson committed in an MSU laboratory.

d.      The Carolina Biological Supply incident: alleged that Newkirk and PETA aided and abetted travel in interstate commerce in furtherance of a scheme to extort Carolina Biological, and that Newkirk and PETA received stolen goods, a predicate act under RICO, and that Newkirk and PETA extorted Carolina Biological via the mail and wires.

e.     The Biosearch incident: alleged that Newkirk and PETA were guilty of mail and wire fraud, the receipt of stolen goods in violation of the RICO statute, and the extortion of Biosearch via threats of economic harm.

f.     The University of Pennsylvania incident alleged that PETA and Newkirk received stolen goods.

These incidents are not alleged to be included as predicate acts in this case, as they occurred too long ago, but are raised to show *scienter*, lack of mistake, intention, and *mens rea* where Defendants Newkirk, Kerr, and PETA are concerned. These are not innocent acts but part of a long career of fraud and extortion for Newkirk, Kerr, and PETA.

## Ongoing Patterns of Fraud and Deceit involving Mail and Wire Fraud, Travel Act violations, and Hobbs Act violations for both Monetary and Ideological Purposes

61.     Although the Plaintiffs allege that PETA has to a large extent been motivated by fundraising in its various schemes, under existing case law, it is not necessary that the predicate acts be motivated by financial gain, or even result in financial gain, to constitute civil violations of the RICO statute. All that is required is that the predicate acts occur and that they be motivated be a desire to bring harm to the Plaintiffs.

62.     PETA and its employees and agents are also a fringe cult of ideological "true believers" and have undertaken any number of bizarre

publicity stunts and frivolous lawsuits in an attempt to gain publicity and to harass its ideological opponents.

63.    Those past lawsuits include PETA suing to free certain Orcas, claiming that the Orcas are protected under the 13th Amendment from "slavery", and a lawsuit attempting to gain copyright ownership for a macaque who accidentally took "selfies" when he was handling a photographer's camera.  The Ninth Circuit Court of Appeals excoriated PETA for that latter lawsuit, ordered that it pay attorney fees for the defendants, and one of the judges suggested rather caustically that perhaps the macaque should sue PETA for breach of fiduciary duty.

64.    More recently, in 2016, PETA has had an undercover investigator unlawfully and tortiously infiltrate the Missouri Primate Foundation and used information obtained to bring suit against the Missouri Primate Foundation, and used that information for publicity and fundraising purposes, and to attempt to shut down the Missouri Primate Foundation.

65.    PETA has further in the last two years made false claims of abuse of animals against the DeYoung Family Zoo in Michigan and against a small zoo in Pennsylvania, the Pocono Snake & Animal Farm. PETA admitted that it had never been to the Pennsylvania zoo to actually investigate the conditions there, but had no compunctions about calling the zoo a "hellhole" on its website and urging its members to action.

66.     In 2017, PETA created a fake video of a cat being abused, and attempted to have media outlets circulate the video without informing the viewership that the video was computer generated imagery rather than a real cat, showing further intent to generally deceive the public in furtherance of donations, publicity, and an ideological agenda.

67.     PETA has as recently as May 2018 run an advertisement for undercover investigators to infiltrate private businesses under false pretenses. It does not advertise that a private detective license or any legal or law enforcement training are required to be hired.

68.     There is no evidence that PETA's "investigators" receive any training as to the applicable laws in the states in which they are sent to infiltrate facilities. PETA does not seek professionalism among its investigators, favoring ideological purity and a commitment to PETA's mission instead.

69.     Throughout the last two years, PETA has repeatedly sent out press releases and blog updates on its web site defaming and harassing several zoos and other facilities throughout the United States, driven by a desire to harm those facilities and to generate funds for itself, all of which violations constitute mail and/or wire fraud qualifying as predicate acts under the RICO statute.  By way of example and not by way of limitation, PETA has published on its web site, in interstate wire communication, the

following statement about Plaintiffs' facility under the title "Highway
Hellholes": "Tri-State has also repeatedly failed to provide animals with
adequate veterinary care, maintain clean and safe enclosures, provide
primates who are held alone with sufficient environmental enrichment, and
provide animals with adequate shelter from the wind and cold temperatures."
These statements as to veterinary care, environmental enrichment, and
providing adequate shelter are absolutely false, were intended to mislead for
the purpose of generating revenue, were made in interstate wire
communication, and it was reasonably foreseeable that the statements would
be made in interstate wire communication. The Plaintiffs are not certain of
the date of first publication of these fraudulent statements, but they were in
circulation by April, 2018, and remain in publication to the day of filing of this
Complaint.

70.     Based on these factors, it is clear that the Defendants are
engaged in a long running, continuous, open-ended scheme and enterprise to
commit mail and wire fraud, to deprive of honest services those victimized by
infiltration of their facilities by false employees and false volunteers, and to
violate the Hobbs and Travel Acts by engaging in acts against the Plaintiffs
and in other acts similar to those undertaken against the Plaintiffs herein. All
of these are predicate offenses under the relevant RICO statutes.

71.     The predicate acts as set forth in this Complaint demonstrate continuity in terms of the scheme and the association-in-fact of the various defendants in the racketeering Enterprise, whether closed ended or open ended, although it is clear that the Enterprise in question is engaged in an open-ended scheme likely to continue into the foreseeable future if not stopped through litigation or other means.

72.     To date the Plaintiffs have suffered reduced revenues in an amount not yet determined, and have incurred attorney fees to defend themselves due to the illegal acts of the Defendants, in an amount not yet certain but not less than $80,000 (Eighty Thousand Dollars).  This amount will grow larger as the Endangered Species Act claim by the Defendants, brought in another case, continues.

COUNT I
RACKETEER INFLUENCED CORRUPT ORGANIZATIONS ACT
18 USC 1962(c) and 1964(c)
All Defendants

73.     The Plaintiffs incorporate paragraphs 1 through 72, above, as though set forth fully under this Count.

74.     The Defendants all were members of and collaborators in conducting a Racketeering Enterprise as defined under 18 USC § 1851, with that Enterprise being the two corporate entities known as People for the Ethical Treatment of Animals, Inc., and The Foundation to Support Animal Protection, Inc. (d/b/a The PETA Foundation).

75.     The Defendants have acted in a structured and hierarchical manner as part of an association-in-fact, with Ingrid Newkirk as President, Jeffrey Kerr as chief legal advisor, Delcianna Winders, Brittany Peet, and Martina Bernstein as attorneys supervising and overseeing the illegal entry onto Plaintiffs' facility, and Colin Henstock and Chris Fontes having actually performed the illegal and fraudulent entry onto the property at the instruction of their superiors in the Enterprise.

76.     The Enterprise has committed several predicate acts giving rise to RICO liability, including the following:

a.      The illegal and surreptitious entry of the Defendants' facility, for the purpose of unlawfully obtaining imagery of the private areas of the Plaintiffs' facility, and for the purpose of unlawfully obtaining imagery of the Plaintiff Robert Candy, including video, photographic, and audio recordings, and the subsequent transmission of that imagery by mail and wire, in an effort to subsequently extort the Plaintiffs' property from them, namely, five tigers and a lion, in violation of the Hobbs Act, 18 USC § 1851. These acts began on December 11, 2014, and have continued to date, with an ongoing attempt to extort property from the Plaintiffs both through non-judicial means and by filing a lawsuit based upon illegal and fraudulent acts committed by Defendants prior to the filing of said lawsuit.

b.      The Defendants have traveled interstate for the purposes of carrying out their illegal schemes, namely, extortion and mail and wire fraud, in violation of the Travel Act, 18 USC § 1952, in violation of the prohibition upon traveling in interstate commerce to promote, manage, facilitate, establish, or carry on an illegal scheme, with those violations of the Travel Act having occurred on or about

December 11, 2014, December 12, 2014, January 28, 2015, and March 4, 2015, at the very least, and quite likely on several occasions following.

      c.     The Defendants have engaged in Mail and Wire Fraud in violation of 18 USC § 1341, 18 USC §1343, and 18 USC §1346, on an ongoing basis, by illegally obtaining the images described above and transmitting them by mail or wire, between participants in the Enterprise, and subsequently, by transmitting those statements in interstate commerce by wire to unwitting donors or prospective donors, who were asked to donate funds, by mail and/or by wire, based upon fraudulent statements about the Plaintiffs' facility, mostly based upon the illegal visits and illegally obtained information. In committing these acts, Defendants voluntarily and intentionally devised or participated in a scheme to defraud their prospective donors out of money, and did so with the intent to defraud. It was reasonably foreseeable that interstate wire communications would be used and interstate wire communications were in fact used.

      d.     The Defendants have further engaged in Mail and Wire Fraud in violation of 18 USC § 1341, 18 USC §1343, and 18 USC §1346, by having offered volunteer services to the Plaintiffs, but with fraudulent rather than honest intentions, and thereby depriving the Plaintiffs of honest services, with communications regarding those services having traveled in interstate commerce by wire between participants, both before and after the events in question in December 2014, January 2015, and March 2015.

e.      The Defendants have engaged in mail and wire fraud through an association-in-fact constituting an Enterprise, that has used the stolen imagery from Plaintiffs' facility to mislead donors throughout the nation, making fraudulent statements in soliciting donations by wire and receiving donations by both mail and wire at least in part as a result of the false statements made about the Plaintiffs' facility, to the detriment of the Plaintiffs, and to the benefit of Defendants fundraising activities, as set forth in Paragraphs 39-44 and Paragraph 69 above. In committing these acts, Defendants voluntarily and intentionally devised or participated in a scheme to defraud their prospective donors out of money, and did so with the intent to defraud. It was reasonably foreseeable that interstate wire communications would be used and interstate wire communications were in fact used.

77.     The Defendants' acts would be sufficient in scope and time to constitute a closed ended scheme under the RICO statute, but it is herein alleged to be an open ended scheme likely to continue into the foreseeable future, based upon the Defendants' acts against these Plaintiffs, fraudulent acts against other parties as stated above, a stated intention by the Enterprise to continue doing what it has been doing for the foreseeable future, and advertising published by the Enterprise seeking additional "undercover" investigators to engage in the same type of work.

78.     The Plaintiffs have been forced to incur at least $80,000 in attorneys' fees to defend themselves from these illegal actions, and have other damages not yet enumerated in lost business revenues, donations, and goodwill.

COUNT II
RACKETEER INFLUENCED CORRUPT ORGANIZATIONS ACT
18 USC 1962(d) and 1964(c)
All Defendants

79.     The Plaintiffs incorporate paragraphs 1 through 79, above, as though set forth fully under this Count.

80.     The Defendants all were members of and collaborators in conspiring to conduct a Racketeering Enterprise as defined under 18 USC § 1851, with that Enterprise being the two corporate entities known as People for the Ethical Treatment of Animals, Inc., and The Foundation to Support Animal Protection, Inc. (d/b/a The PETA Foundation), with such conspiracy aimed at violating 18 USC 1962(c) among other laws.

81.     The Defendants all agreed and conspired to act in a structured and hierarchical manner as part of an association-in-fact, with Ingrid Newkirk as President, Jeffrey Kerr as chief legal advisor, Delcianna Winders, Brittany Peet, and Martina Bernstein agreeing and conspiring to serve as "attorneys" supervising and overseeing the illegal entry onto Plaintiffs' facility, and Colin Henstock and Chris Fontes agreeing and conspiring to actually perform the illegal and fraudulent entry onto the property at the instruction of their superiors in the Enterprise.

82.     The Enterprise and all Defendants agreed and conspired to commit

several predicate acts giving rise to RICO liability, including the following:

a.      A conspiracy to commit the illegal and surreptitious entry of the

Defendants' facility, for the purpose of unlawfully obtaining imagery of the private

areas of the Plaintiffs' facility, and for the purpose of unlawfully obtaining imagery

of the Plaintiff Robert Candy, including video, photographic, and audio recordings,

and the subsequent transmission of that imagery by mail and wire, in an effort to

subsequently extort the Plaintiffs' property from them, namely, five tigers and a lion,

in violation of the Hobbs Act, 18 USC § 1851. These acts began on December 11,

2014, and have continued to date, with an ongoing attempt to extort property from

the Plaintiffs both through non-judicial means and by filing a lawsuit based upon

illegal and fraudulent acts committed by Defendants prior to the filing of said

lawsuit.

b.      A conspiracy to travel interstate for the purposes of carrying out their

illegal schemes, namely, extortion and mail and wire fraud, in violation of the Travel

Act, 18 USC § 1952, in violation of the prohibition upon traveling in interstate

commerce to promote, manage, facilitate, establish, or carry on an illegal scheme,

with those violations of the Travel Act having occurred on or about December 11,

2014, December 12, 2014, January 28, 2015, and March 4, 2015, at the very least,

and quite likely on several occasions following.

c.      A conspiracy to commit Mail and Wire Fraud in violation of 18 USC §

1341, 18 USC §1343, and 18 USC §1346, on an ongoing basis, by illegally

obtaining the images described above and transmitting them by mail or wire,

between participants in the Enterprise, and subsequently, by publishing false statements and misusing stolen or misappropriated images on the internet, in electronic form constituting wire communications, to unwitting potential donors, who were asked to donate funds, by mail and/or by wire, based upon fraudulent statements about the Plaintiffs' facility, mostly based upon the illegal visits and illegally obtained information.  These fraudulent publications, including the false statements alleged above in paragraphs 39-44 and paragraph 69, were made in order to defraud donors and prospective donors by injuring the Plaintiffs, it was reasonably foreseeable that the statements would be communicated in interstate commerce by wire, and the statements were in fact communicated in interstate commerce by wire, and resulted in injury to the Plaintiffs due to the falsehood of the statements. In committing these acts, Defendants voluntarily and intentionally devised or participated in a scheme to defraud their prospective donors out of money, and did so with the intent to defraud. It was reasonably foreseeable that interstate wire communications would be used and interstate wire communications were in fact used.

       d.     A conspiracy to further engage in Mail and Wire Fraud in violation of 18 USC § 1341, 18 USC §1343, and 18 USC §1346, by having offered volunteer services to the Plaintiffs, but with fraudulent rather than honest intentions, and thereby depriving the Plaintiffs of honest services, with communications regarding those services having traveled in interstate commerce by wire

between participants, both before and after the events in question in December 2014, January 2015, and March 2015.

e.    A conspiracy to engage in mail and wire fraud through an association-in-fact constituting an Enterprise, to use the stolen imagery from Plaintiffs' facility to mislead donors throughout the nation, soliciting donations by wire and receiving donations by both mail and wire at least in part as a result of the false statements made about the Plaintiffs' facility, to the detriment of the Plaintiffs, and to the benefit of Defendants fundraising activities.

83.    The Defendants' acts would be sufficient in scope and time to constitute a closed ended scheme under the RICO statute, but it is herein alleged to be an open ended scheme likely to continue into the foreseeable future, based upon the Defendants' acts against these Plaintiffs, fraudulent acts against other parties as stated above, a stated intention by the Enterprise to continue doing what it has been doing for the foreseeable future, and advertising published by the Enterprise seeking additional "undercover" investigators to engage in the same type of "work."

84.    The Plaintiffs have been forced to incur at least $80,000 in attorneys' fees to defend themselves from these illegal actions, and have other damages not yet enumerated in lost business revenues, donations, and goodwill.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, the Plaintiffs pray that the Court enter a judgment against the Defendants, jointly and severally, for:

A.      Monetary Damages in the amount of three times the actual damages of the Plaintiffs, with underlying actual damages at present estimated to be $80,000 but likely to be higher as time progresses, and therefore Plaintiffs shall amend this claim as circumstances warrant; and,

B.      Reasonable Attorney Fees for the Plaintiffs as allowed by 18 USC 1964; and,

C.      That this matter be tried before a JURY; and,

D.      For whatever other relief the circumstances merit.

Respectfully Submitted,


____s/Nevin L. Young_____
Nevin L. Young
Fed Bar. ID No. 28604
170 West Street
Annapolis Maryland 21401
(t) 410-353-9210
(f) 410-510-1208
nyoung@burlingtonyounglaw.com